[L. A. No. 2081. In Bank.—May 24, 1909.]

W. D. TURNER, Respondent, v. H. H. MARKHAM and GEORGE H. COFFIN, Appellants; AMERICAN BOY GOLD MINING COMPANY (a Corporation), Respondent.

CORPORATIONS—ACTION BY STOCKHOLDER FOR BENEFIT OF CORPORATION —NATURE OF ACTION.—An action brought by a stockholder for the benefit of a corporation, is in its nature and essence to recover redress for some legal wrong which the corporation itself has suffered, and to prevent a failure of justice, when the directors have refused to prosecute the action.

ID.—PERSONAL INJURY OR LOSS TO STOCKHOLDER NOT CONSIDERED.—If the corporation itself has suffered no wrong, cognizable at law or in equity, it matters not how just and how grievous may be the complaint of the stockholder, nor how complete may be the proof

of his personal loss, damage, or injury, but he will be compelled
to resort to his individual action to obtain a personal recovery.

ID.—LEGAL AGREEMENT OF ORGANIZERS TO ACQUIRE MINES WITH STOCK.
—It was perfectly legal and proper for all the parties in interest
in the formation of the corporation to agree to sell all or any part
of its stock in return for mining claims or anything else of value.
The stock could only acquire a value by the corporation acquiring
property, and if it was chosen that its whole six thousand shares
of its stock should be issued to pay for securing mining claims
worth at the time twenty thousand dollars and believed to have a
large prospective value, the transaction was perfectly legal.

ID.—AGREEMENT EFFECTUATED—CORPORATION NOT INJURED.—*Held*, that
the evidence establishes that the agreement between the incorporators
was not abandoned, but was effectuated; that the only agreement
was to acquire definite mining claims, which were acquired and con-
veyed to the corporation; and that every officer and stockholder
of the corporation knew the terms under which the stock was given
up and the property received, and that the corporation was not in-
jured, nor in a position to repudiate the transaction merely because
of its inadvertence in not having it formally entered upon its
minutes.

ID.—ABANDONMENT OF CONTRACT A QUESTION OF INTENT—INTENT DIS-
PROVED.—The abandonment of a contract is a question of intent, and
the intent to abandon must be established by declarations or con-
duct. *Held*, that the evidence is conclusive of any intention to
abandon the contract.

ID.—MINING CLAIMS HELD FOR A TIME BY TRUSTEE OF CORPORATION—
CONVEYANCE.—The circumstance that the mining claims were held
for a time by one of the stockholders and directors in trust for
the corporation, and were by him conveyed to it, could not tend
to show abandonment of the contract, or to show any fraud in the
statement that the property was then owned by the subscribers to
the stock, the corporation being then the equitable owner of the
property, which was not injured, since it became the legal owner
by conveyance from the trustee.

ID.—ORAL AGREEMENT CONSUMMATED — SUBSEQUENT TRANSACTIONS
AFFECTING SINGLE STOCKHOLDERS.—The oral agreement having been
consummated, any subsequent action by the appellants affecting only
individual stockholders, cannot injure the corporation, and findings
and a judgment against them based upon injury to the plaintiff
as a stockholder or as representing stockholders must be set aside
and reversed.

APPEAL from a judgment of the Superior Court of Los
Angeles County and from an order denying a new trial.
Curtis D. Wilbur, Judge.

The facts are stated in the opinion of the court.

Wright, Bell & Ward, Benjamin Page, and Walter Trask, for H. H. Markham, Appellant.

Shankland & Chandler, for George H. Coffin, Appellant.

Porter, Sutton & Cruickshank, and Hunsaker & Britt, for Plaintiff, Respondent.

HENSHAW, J.—This action was brought by the plaintiff, a stockholder of the American Boy Gold Mining Company, a corporation organized under the laws of Arizona, for and on behalf of the corporation, against the defendants Markham, its president and general manager, and Coffin, its secretary, to recover moneys alleged to have been misappropriated, and the value of stock of the corporation alleged to have been wrongfully issued to and taken by the defendants. Judgment was given against the defendants for $116,842.81 for moneys found to have been misappropriated and for the value of stock of the corporation wrongfully taken by the defendants. From this judgment and from the order denying their motion for a new trial defendants appeal.

The following facts are either found by the court or stand uncontradicted on the evidence: In 1889 the defendants Markham and Coffin, together with D. W. Field, F. S. Daggett, and G. D. Patten were stockholders and the controlling directors of the American Girl Gold Mining Company, a corporation organized under the laws of Arizona, owning mining claims in San Diego County, California. The American Girl Gold Mining Company was working and developing its claims, and it was believed by its directors that these claims were of great value. Adjacent to the claims of the "Girl Company" were other unpatented claims held by Kendrick and Strickland. It was believed by the directors of the "Girl Company" that their pay-vein or lode continued into the Kendrick and Strickland claims. It was believed also that the development work upon the "Girl" claims would prove the Kendrick and Strickland claims to be of great value. Inquiry being made, it was learned that these claims could be secured for twenty thousand dollars. Whereupon Markham, Coffin, Field, Daggett, and

Patten made and entered into an oral agreement, the terms of which are as follows: A corporation was to be organized by these five associates under the laws of Arizona, to be known as the American Boy Gold Mining Company, with an authorized capital stock of three hundred thousand dollars, divided into 6000 shares of the par value of fifty dollars each. The entire capital stock was to be subscribed for by the five associates, who were to pay for it by securing and conveying to the corporation the Kendrick and Strickland claims. The allotment of the 6000 shares was to be as follows: To each of the five associates 800 shares; to one Thomas Johnson, the superintendent of the "Girl Company," 400 shares for his services in aiding to secure the Kendrick and Strickland claims at a reduced figure; and 100 shares for which Johnson was to pay at the rate of ten dollars per share. The remaining 1500 shares were to be issued to and held by defendant Markham as trustee for the associates. It was further agreed that each of the five was to guarantee and pay to Markham, as trustee, the sum of eight thousand dollars. This money was to be a fund in the hands of Markham, to be used by him in the purchase and for the development of the claims which the "Boy Company" was thus to acquire. Pending the payment by the individual associates of the eight thousand dollars thus guaranteed, their stock, saving sufficient to enable them to qualify as directors, was to be issued to Markham as trustee. The "Girl Company" being a "going" mine, with water, power, and machinery, the development of its vein in the direction of the Kendrick and Strickland claims would tend to prove the latter's value, and so it was agreed that Markham, in his discretion, might expend the money either upon the "Boy" claims or upon the "Girl" claims. Coffin was authorized to obtain an option for the purchase for twenty thousand dollars of the Kendrick and Strickland claims, which were to be conveyed to the defendant corporation upon its organization. It was understood that portions of the stock should be sold to the public and the proceeds of such sales used in paying for the Kendrick and Strickland claims and in developing the property.

Following this agreement, upon June 21, 1899, a written agreement was entered into between Kendrick and Strickland on the one side, and Coffin, designated in the agreement as

"trustee for the American Boy Gold Mining Company," wherein Kendrick and Strickland agreed to sell their claims to Coffin, Coffin agreeing to pay them twenty thousand dollars, five thousand dollars to be paid on or before sixty days from June 20, 1899, and fifteen thousand dollars on or before six months from June 20, 1899. The agreement provided that upon the organization of the corporation and the payment of five thousand dollars, Kendrick and Strickland would execute a deed of the claims and place it in escrow to be delivered to Coffin upon final payment by him of the fifteen thousand dollars. Articles of incorporation under the laws of Arizona were then prepared, and about the time of their execution a subscription agreement was executed as follows:—

"We, the undersigned, do hereby subscribe for the amount of stock of the American Boy Gold Mining Company set opposite our respective names, and we further agree to pay for same by transferring to said corporation certain mines and mining claims, and other properties, money, or services, as may be received by the corporation as payment in full upon said stock.

| "Name. | Amount. |
| --- | --- |
| "F. S. Daggett | 20 shares. |
| "D. W. Field | 20 shares. |
| "G. D. Patten | 20 shares. |
| "Thomas Johnson | 500 shares. |
| "Geo. D. Coffin | 1,000 shares. |
| "H. H. Markham | 1,500 shares. |
| "H. H. Markham | 2,940 shares." |

In explanation of this subscription it may be added, to what has already been said, that Coffin and Markham were to handle and dispose of the stock. The 1500 shares subscribed by Markham was the trustee stock above mentioned; the 2940 shares, as well as the excess of 200 shares, subscribed by Coffin over and above his 800 share allotment, or, in other words, the 3140 shares apportioned, 2940 to Markham and 200 to Coffin, represented: 1. Markham's 800 shares; and 2. The 780 shares of the 800 shares actually subscribed for by Daggett, Field, and Patten, but to be held by Coffin and Markham, or sold by them, to make good Daggett, Field, and Patten's guaranty of eight thousand dollars each.

The articles of incorporation were executed by Markham, Daggett, Patten, Field, and Johnson. Coffin, while not appearing as an incorporator, is an affirmative and uncontradicted witness to the effect that he knew of and took part in all of these agreements and transactions. The laws of Arizona required that the articles of incorporation should show "the amount of capital stock authorized and the time when and the conditions upon which it is to be paid in." The articles of incorporation of the American Boy Gold Mining Company declare as follows:—

"Article III. The amount of the capital stock authorized by the corporation shall be the sum of $300,000, divided into 6,000 shares of the par value of fifty ($50) dollars each, and the time when and the conditions upon which it is to be paid in are as follows: The entire amount thereof has been subscribed and will be paid in full upon the filing of these articles with the county recorder of the said county of Yuma, by the subscribers deeding to the corporation certain mines, mining locations and other property now owned by the subscribers in the State of California."

On July 8, 1899, the corporation having been formed, a meeting of the stockholders was held in the city of Yuma, the principal place for the meeting of stockholders as named in the articles. At that meeting all of the stock of the corporation was represented, in accordance with the terms of the subscription agreement; all of the stockholders were present by proxy, saving Johnson, who was present in person. Markham, Daggett, Field, Patten, and Johnson were elected directors; and by-laws were adopted, which, amongst other things, designated Pasadena, California, as the place for holding meetings of the directors. No further business appears to have been transacted. The meeting adjourned and no other meeting of stockholders has ever been held. On July 17, 1899, a meeting of the directors was held in Pasadena, where officers of the corporation were elected as follows: Markham, president and general manager; Johnson, vice-president; Coffin, secretary; Daggett, treasurer. No other business was transacted at this meeting, and no other directors' meeting has been held. Thereafter, Markham, as president and general manager, and Coffin, as secretary, assumed entire management and control of the corporation property. On July 11 or 12, 1899,

five thousand dollars having been paid to them by Coffin, Kendrick and Strickland signed and acknowledged a deed of their mining claims to the American Boy Gold Mining Company, and deposited it in escrow in accordance with their agreement. On December 13, 1899, on payment of the balance of fifteen thousand dollars, the depositary delivered the deed.

Sales of stock were made to the public. Taking up these sales for the moment, upon the theory of the defendants that the associates became the owners of the stock under their guarantees to pay to the trustees the sum of eight thousand dollars each,—as to Coffin's allotment of 800 shares it is shown that he sold 699 shares for the total net price of $12,121.85, all of which money was delivered to Markham. Of the 101 shares remaining, a certificate for 100 shares was taken by Coffin, and the remaining 1 share stands without certificate issued.

Of Daggett's 800 shares, 790 were sold, producing $8,012.50, delivered to Markham, leaving a residue of ten shares for which no certificate has been issued.

Of Field's 800 shares, 100 were sold, producing two thousand dollars, and Field personally paid six thousand dollars additional to Markham.

Patten's 800 shares were issued to him in two certificates of 655 and 145 shares, respectively, Patten paying to Markham eight thousand dollars therefor.

Of Markham's 800 shares, 575 were sold, producing $7,450, leaving 225 shares for which no certificate was issued.

Of Johnson's 500 shares, certificates for 400 were issued, and Johnson paid the sum of $1,000, which, under the parol agreement, was all that he was called upon to pay.

Of the 1500 shares, trustee stock, or joint-allotment stock, to be held by Markham for the common benefit of the associates, it is unnecessary to say more than that some of it was sold and the proceeds received by Markham.

The total amount of money thus received by Markham was $52,654.35. This money was kept by Markham personally and used by him in accordance with the understanding of the associates under their parol agreement. Thus, twenty thousand dollars was paid to Kendrick and Strickland for their claims, $9,476.49 for the legitimate expenses of the cor-

poration and for work on the claims, while the remaining sum of $23,177.86 was expended upon the properties of the American Girl Gold Mining Company and for the benefit of that corporation. 2880 shares of the stock are found to have been appropriated by Markham and Coffin and issued by them to various parties without consideration, and without authorization from the corporation, and they are charged with the reasonable market value of that stock at the rate of twenty dollars per share, or $57,600. These sums of $23,177.86 and $57,600, the value of stock with interest, make the judgment of $116,842.81 awarded against Markham and Coffin for the benefit of the defendant corporation.

The facts above set forth outline the conflicting views or theories of appellants and respondents upon this appeal. By respondents it is insisted (and such is the effect of the findings of the trial court) that the oral agreement was not consummated, but was abandoned; that therefore all of the stock of the corporation was, and continued to be its own treasury stock, saving such portions of it as were properly sold; that the mining claims of Kendrick and Strickland were bought with moneys derived from the sale of the treasury stock; that all of the stock of the corporation taken or caused to be issued by Markham and Coffin, excepting such as was sold to "outside" stockholders at full market value (found by the court to be twenty dollars per share) was misappropriated stock, for the value of which, at twenty dollars a share, Markham and Coffin were accountable to the corporation. Upon the other hand, the contention of the appellants is that the oral agreement of the associates was legal and was fully effectuated; that by its effectuation the associates became, in equity, the owners of all the capital stock of the corporation, and that in their subsequent dealings and transactions with this stock and with the moneys derived from the sale thereof, the corporation, for whose benefit this action is maintained, and for whose benefit only it can be maintained, has suffered no wrong either at law or in equity. In terms, appellants' views are presented under attacks upon the sufficiency of the evidence to sustain the findings, and to a consideration of this question of all-controlling importance we are now brought.

At the threshold of this inquiry, however, it is proper to pause to point out what is the exact nature of the action

before us. In its essence, it is an action brought by the corporation itself to recover redress for some legal wrong which the corporation itself has suffered. To prevent a failure of justice, as where the governing board of directors or trustees of the corporation refuses to prosecute such an action, the law permits a stockholder to begin and maintain it on behalf of the corporation. But the fact that a stockholder is the nominal plaintiff in such an action, whether he prosecutes it as an individual stockholder or as a representative of a class of disaffected stockholders, does not in any manner, or to the slightest extent, enlarge the rights and remedies of the action. The action must still be founded upon some wrong which the corporation, as a corporation, has suffered, and for which, if itself were plaintiff, it could secure legal or equitable redress. Therefore, if the evidence shall establish that the corporation itself has suffered no wrong, cognizable either at law or in equity, it will matter not how just and how grievous may be the complaint of the individual stockholder, nor how complete may be the proof of his personal loss, damage, or injury. In this action on behalf of the corporation no recovery can be had, and the stockholder will be compelled to proceed by his individual action to obtain a personal recovery. (3 Pomeroy's Equity Jurisprudence, 3d ed., pp. 2123 et seq.; Cook on Stock and Stockholders, sec. 692; *Davenport* v. *Dows,* 18 Wall. 626; *In re Ambrose etc.,* L. R. 14, Ch. Div. [Eng.] 390; *Langdon* v. *Fogg,* 18 Fed. 5; *Stewart* v. *St. Louis R. R. Co.,* 41 Fed. 736; *Foster* v. *Seymour,* 23 Fed. 65.)

No conflict arises, or indeed could arise, over so plain a proposition, and it may seem superfluous thus to emphasize it. But it is here emphasized: 1. Because it is all important and to be continually borne in mind in considering the evidence; and 2. Because of the conviction which an examination of that evidence forces upon us, that, by oversight, the learned judge of the trial court failed to carry this distinction throughout the case, and erroneously confounded the wrongs and equities of the individual stockholders with the wrongs and equities of the corporation.

Stripped to its essentials, what then was the condition at the time of the organization of the defendant corporation? It was this: There stood a corporation, owning no property, whose stock was, therefore, absolutely valueless. It was per-

fectly legal and proper for all the parties in interest in such
a corporation to do as here they agreed to do—sell all or any
part of the stock of the corporation in return for mining
claims, or for anything else of value. The stock could acquire
a value only by the corporation acquiring property, and if
it chose to issue its 6000 shares of stock for property of the
value of five or ten or twenty thousand dollars, it did what
it had a perfect right to do, and committed no wrong. If it
issued its stock in exchange for property worth twenty thou-
sand dollars, the logical result would be that each of the 6,000
shares would be worth $3.33, and if, in that condition of its
affairs, its stock was sold for more than $3.33 a share, the
enhanced price would be a "made" value, based upon the rep-
resentations of the sellers and the anticipations of the buyers.
Not only is a transaction such as that contemplated in the oral
agreement of the associates good in law, but it is one of com-
mon, indeed almost of daily, occurrence in the formation of
corporations. (*Charter* v. *Sugar Refining Co.*, 19 Cal. 219;
*Smith* v. *Ferries & C. H. Ry. Co.*, (Cal.) 51 Pac. 710; *Keller-
main* v. *Maier*, 116 Cal. 416, [48 Pac. 377]; *Scadden Flat G.
M. Co.* v. *Scadden*, 121 Cal. 33, [53 Pac. 440]; *Garretson* v.
*Crude Oil Co.*, 146 Cal. 184, [79 Pac. 838]; Morawetz on Cor-
porations, sec. 267; Cook on Stock & Stockholders, sec. 38.)

Since the agreement which the associates and incorporators
proposed to carry out was not illegal, and since the court
found that the agreement was entered into, the court must
have concluded either that the agreement was abandoned, or
that by reason of the fraud of the defendants (which fraud
it must be borne in mind must have been a fraud perpetrated
upon the corporation and not upon any individual stockhold-
ers thereof), they are estopped from asserting that it was
effectuated. The findings of the court are not specific upon
the question. It is found, for example, that the stock of the
defendant corporation was not sold by the subscribers, but
was sold for the corporation. It is found that none of the
stockholders, excepting Markham, Coffin, Johnson, Field, Pat-
ten, and Daggett, knew of the agreement. It is found that
all of the moneys which came into the hands of the defend-
ants were received by them as the proceeds of the sale of the
stock of the corporation, and that none was received as con-
tributions from either Markham or Coffin. It is found that

defendants Markham and Coffin themselves, and by their agents, represented to persons to whom stock was offered for sale and who afterwards purchased it, that it was the stock of the corporation, and that the money received from the purchasers of the stock was to be used by the defendant corporation in paying for and developing the mining claims purchased from Kendrick and Strickland, and that these representations were made for the purpose of inducing these persons to buy the stock; that none of the subscribers to the articles of incorporation or to the stock, conveyed or transferred to the mining company any mines, mining locations, or other property; that all of the stock issued and appropriated by the defendants was the property of the mining company. All these, and other findings to like effect, mean, as has been said, either that the parol agreement was abandoned and not effectuated, or that, if effectuated, it was effectuated under such circumstances of fraud as forbid recognition of it at the instance of the defendants.

Was the agreement abandoned? Abandonment is governed by intent, and the intention to abandon must be established by declaration or by conduct. All of the associates were witnesses in this case, save Patten, who was dead, and all testified to their understanding and belief not only that the parol agreement was not abandoned, but was fully effectuated. The circumstance that Coffin took his contract of sale for the Kendrick and Strickland claims in the name of himself, as trustee for the corporation which had not even then been formed, certainly was not evidence of abandonment, and the circumstance is explained by Coffin that he did this in furtherance of the agreement, and caused himself to be designated as trustee so that, in the event of his death, there could be no question as to what disposition it was intended should be made of the properties. Article 3 of the articles of incorporation above quoted it is said is too indefinite in its description, and contains a false statement to the effect that the subscribers own certain mining claims. But the indefiniteness amounts to nothing in view of the fact that it is not at all in dispute but that the property, and the only property, contemplated by the article, which the corporation was to acquire or ever expected to acquire was the Kendrick and Strickland claims which were conveyed to it. And that there was an over-

statement of the fact in the declaration that the mining prop-
erties were "now owned" by the subscribers, was not a circum-
stance of fraud: 1. Because there was a certain equitable in-
terest or ownership which they had in the property by reason
of the contract made with Coffin; and 2. Because so long as
the particular property was conveyed to the corporation, the
corporation was not injured in the statement that the incor-
porators were the then owners of it.  So far as the corpora-
tion and its rights are concerned, the case then stood, that
its articles show an executory contract (*Pinney* v. *San Nelson*,
183 U. S. 144, [22 Sup. Ct. 52]; *San Joaquin L. & W. Co.*
v. *Beecher*, 101 Cal. 70, [35 Pac. 349]), whereby the corpora-
tion agreed to issue its stock to certain named subscribers in
consideration of their deeding to it the Kendrick and Strick-
land mining claims.  And as the corporation owned no property
and its stock was therefore valueless, it could acquire a value
only by an exchange of its stock for property, coupled with
the energetic efforts of the subscribers to increase the value
of the property which was thus acquired.  Every person, then,
in interest in the corporation, every person who by any pos-
sibility could be considered an officer or stockholder, joined
in and assented to this plan.  At the stockholders' meeting all
of the stock upon the books of the company is shown as issued
stock held in private ownership.  By this we do not mean
to be understood that the shares were actually issued, torn
from the stock-book and delivered to the owners, but the stock
itself was declared to be held and owned in private ownership
and was all so voted.  Here, clearly, there was no abandon-
ment, but rather positive evidence of a prosecution to comple-
tion of the oral agreement.  The corporation might have been
heard to insist that the issuance of its stock should follow
the conveyance to it of the Kendrick and Strickland claims,
but it did not so object.  The Kendrick and Strickland claims
in due course were conveyed to and accepted by it, and the
transaction thus became completely closed, saving for the one
omission upon the part of the board of directors to have
formal recognition and acceptance of the transaction entered
upon their minutes.  But can it be doubted that this omission
was the result of mere inadvertence and that it would have
been supplied since the same subscribers remained as directors
during all the time, if attention had been directed to it?  And,

by its absence, was the corporation injured? For that, after all, is the single question that forever must present itself in this case. The corporation, in effect, had agreed in its articles of incorporation and in the subscription list, to sell all of its stock for the Kendrick and Strickland claims. It gave up its stock, it received and accepted the claims. As to it, the transaction was complete, and, except for some fraud put upon it, it was not in a position to repudiate the transaction. Every officer and stockholder of the corporation knew the terms under which the stock was given up and the property received. Every one assented to it, and we are unable to perceive how, from any possible viewpoint, it can be said that by this transaction the corporation was injured or defrauded to the slightest extent. The findings themselves throw light upon the matter. Those findings, while declaring that the use of the twenty-three thousand dollars spent by Markham and Coffin in developing the "Girl mine" was improper, assert in the same sentence that Markham and Coffin "believed that they had the right so to do under the oral agreement set forth." So, in finding that 2880 shares of the stock was misappropriated by Markham and Coffin and issued and taken by them without authority of the corporation, it is also found that they "believed that they had the right so to do under the oral understanding set forth." They could not have believed that they had the right so to do, as the court finds, unless they also held the belief, not that the oral agreement was abandoned, but that it had been fully effectuated.

If it was so effectuated, then the case of the respondents is at an end. That the transaction was consummated to the last detail, saving only for the absence of a formal resolution of ratification upon the books of the corporation, this evidence, as we have reviewed it, clearly establishes, and that the absence of a resolution of acceptance is not a ground for complaint or repudiation upon the part of the corporation which has accepted the mining claims is also we think quite plain.

If the transaction then, as we have said, was thus carried through, the subsequent conduct and representation of the defendants, whatever they may have been, could not have wronged the corporation, and here, we think that the learned trial judge misconceived the effect of the evidence touching the later conduct and transactions of these defendants. Thus,

the books of account of the corporation, it is found, were wrongfully and erroneously kept. Under the theory that all the moneys derived from the sale of the stock belonged to the corporation, they were certainly imperfectly and erroneously kept. But the testimony of the treasurer of the corporation, Daggett, is that the corporation never had a dollar of money, and that of Coffin, the secretary, by whom in fact the books were kept, goes to the effect that while, in terms, they were named as account books of the corporation, all the moneys were received by Markham under the agreement, and the expenditures made by him, and in most instances by his personal check, and the books which he (Coffin) kept, were but a convenient method of showing to the parties in interest the dispositions made of the fund. So, too, the finding against Markham of depositing the funds of the corporation to his private account and expending them without authority, though in the belief that he had the right so to do, are pertinent and grave, under the view that these moneys were the moneys of the corporation, but amount to nothing more than what Markham had the right to do, if the oral agreement was consummated. And, indeed, it may be proper here to say that the case presents no feature of the misappropriation of any of these moneys for the individual benefit of any of the associates. The expenditure of every dollar which Markham received is shown to have been for the positive benefit of the corporation, either directly upon the properties themselves, or indirectly, though no less substantially, upon the adjoining "Girl" claims, whose development it is conceded would prove the value of the "Boy" properties. It is found, as above adverted to, that Markham and Coffin represented to certain of the stockholders that they were selling corporation stock or treasury stock, and these representations, it is argued by respondent, show that the defendants were then engaged in committing gross, actual, and intentional fraud, or that they then considered that the stock which they were selling belonged to the corporation. It is said also in this connection, that these representations so found to have been made work an estoppel against the defendants from here denying that the stock was in fact the stock of the corporation. Precisely here, we think, the error of the trial court crept in. There seems to have been a confounding of the injury which may

thus have resulted to the individual stockholder who purchased upon the faith of the representation, with an injury to the corporation, as well as the raising of an estoppel by the declarations of a party to one person, not in favor of that person, but in favor of another to whom the declarations were not made, nor even knowledge of them to be conveyed. Thus, if A, upon the street, sells to B his own stock, under the representation to B that it is treasury stock, the corporation is not injured, nor is A estopped in an action by the corporation from asserting that the stock was his own. B, to whom the representations were made, may have suffered by them, may have his cause of action for redress and may insist upon an estoppel against A, but that estoppel only runs for his benefit and to prevent A from taking advantage of the wrong which he has perpetrated, not upon the corporation, but upon B. And so, whatever may have been the representations of Markham and Coffin as to the treasury stock, only those who purchased in reliance upon such representations can be heard to complain. The same is true of the declarations made by Markham to the disaffected stockholders after work had ceased and the mining claims appeared to be of no value. He said he would furnish them a statement, and believed there was about eleven thousand dollars in the treasury of the company. These declarations did not injure the corporation, and the law preferring an interpretation of conduct that makes for fair dealing, rather than for fraud, they are certainly open to the explanation that what Markham really meant was that he had employed all of this money, as in fact he had, for the benefit of the corporation, and not for the individual benefit of himself or of any other person, and that he believed there was about eleven thousand dollars unexpended.

The conclusion thus reached, that the principal findings are unsupported, and that the conduct of Markham and Coffin and their associates, so far as the corporation is concerned, was not facinorous, renders unnecessary a consideration of any of the other propositions advanced by appellants.

For the foregoing reasons the judgment and order are reversed and the cause remanded.

Angellotti, J., Shaw, J., Melvin, J., and Sloss., J., concurred.

Rehearing denied.