[Civ. No. 34185. First Dist., Div. One. Aug. 12, 1976.]

ADDISON MUELLER, Plaintiff and Appellant, v.
MICHAEL F. B. MacBAN, as Savings and Loan Commissioner, etc.,
Defendant and Respondent;
A. C. MEYER, JR., et al., Real Parties in Interest and Respondents.

## COUNSEL

Munger, Tolles, Hills & Rickershauser, Alan Jay Moscov, Arata, Misuraca & Clement, Clayton E. Clement and Kenneth E. Scott for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Melvin R. Samuel, Deputy Attorney General, for Defendant and Respondent.

Angell, Adams & Holmes, Lyman G. Lea, Andrew H. Field, J. Kenny Lewis, Barry D. Hovis, Hahn, Cazier, Hoegh & Leff, Ernest Leff, Robert R. Thornton, Julian A. Pollok and Andrew E. Katz for Real Parties in Interest and Respondents.

## OPINION

**MOLINARI, P. J.**—This is an appeal by petitioner from a judgment denying his petition for a writ of mandate under section 1094.5 of the Code of Civil Procedure. The judgment sustained a determination made pursuant to section 7616 of the Financial Code[1] by respondent. The Savings and Loan Commissioner of the State of California (hereinafter referred to as "Commissioner") that petitioner could not bring a derivative action on behalf of Fidelity Financial Corporation (hereinafter referred to as "Fidelity Financial"), and Fidelity Savings and Loan Association (hereinafter referred to as "Association").

The real parties in interest are Association, Fidelity Financial, Guaranty Services Corporation (hereinafter referred to as "Guaranty"), A. C. Meyer, Jr., Philip H. Angell, Jr., and Thomas Kerr.

### Statement of the Case

Pursuant to the provisions of section 7616 petitioner filed an application with the Commissioner for permission to institute and maintain a stockholder's derivative suit on behalf of Fidelity Financial and Association against Fidelity Financial, Association, Meyer, Angell, Kerr and Guaranty.

Section 7616 provides as follows: "No action may be instituted or maintained in the right of any association by any shareholder or

---

[1]Unless otherwise indicated all statutory references are to the Financial Code.

certificate holder, as such. Such action may not be instituted or maintained by a stockholder of any association, unless all of the following conditions exist:

"(1) The plaintiff alleges in the complaint that he was a registered stockholder at the time of the transaction or any part thereof of which he complains or that his stock thereafter devolved upon him by operation of law from a holder who was a holder at the time of the transaction or any part thereof complained of.

"(2) The plaintiff alleges in the complaint with particularity his efforts to secure from the board of directors such action as he desires and alleges further that he has either informed the association or such board of directors in writing of the ultimate facts of each cause of action against each defendant director or delivered to the association or such board of directors a true copy of the complaint which he proposes to file, and the reasons for his failure to obtain such action or the reasons for not making such effort.

"(3) The commissioner shall have determined, after a hearing upon at least 20 days' written notice to such association and each of its directors, that such action (a) is proposed in good faith and (b) there is reasonable possibility that the prosecution of such action will benefit the association and its stockholders.

"Subdivisions (b) and (c) of Section 834 of the Corporations Code shall be applicable in the case of any such action."

The gist of the proposed action is that Meyer and Angell acquired stock in Association, a savings and loan association, as the result of an exchange of their stock in Peninsula Savings and Loan Association (hereinafter referred to as "Peninsula") upon the merger of Peninsula into Association; that such exchange was illegal; and that Meyer, Angell, and Kerr made "insider profits" as a result of the merger. Petitioner, as a shareholder in Fidelity Financial, a savings and loan holding company owning 99.9 percent of the outstanding stock of Association, seeks by the derivative action to compel Meyer and Angell to return to Fidelity Financial stock of Fidelity Financial issued to them in exchange for their shares of stock in Association.

Following a hearing the Commissioner determined that petitioner had met the conditions specified in subdivisions (1) and (2) of section 7616

but that he did not meet the conditions specified in subdivision (3) of the statute. Accordingly, the Commissioner denied petitioner's application on the grounds that petitioner's proposed action is not proposed in good faith and there is no reasonable possibility that the prosecution of such action will benefit Association and its stockholders. The Commissioner made no specific determination with respect to Fidelity Financial.

### Fidelity Financial

■ It is asserted by Meyer, Angell, Kerr and Guaranty that the applicability of section 7616 was not a contested issue in the case. This assertion appears to have merit in view of the Commissioner's failure to make any specific determination with respect to Fidelity Financial. In any event, all of the real parties contend that section 7616 is inapplicable to Fidelity Financial because it is not a savings and loan association but a savings and loan holding company. We are persuaded that there is merit to this contention.

Section 7616 specifically states that "No action may be instituted or maintained in the right of any *association* by any shareholder or certificate holder, as such. Such action may not be instituted or maintained by a stockholder of any *association,* unless all of the following conditions exist: . . ." (Italics added.) Section 7616 refers to "association" six times and it makes no reference to holding companies. The savings and loan association statutes are contained in division 2 of the Financial Code of which section 7616 is a part. The definitions applicable to savings and loan associations are also contained in this division (art. 2, ch. 1, pt. 1) and are set forth in sections 5050 to 5075. Section 5050 provides that: "Unless the context otherwise requires, the definitions set forth in this article govern the construction of this division." Section 5055, in pertinent part, provides: " 'Association' means a savings and loan association, as defined in this article, . . ." A savings and loan association is defined in section 5057 as follows: " 'Savings and loan association' means any institution incorporated to conduct, or conducting, the business of receiving and lending money in accordance with the provisions of this part, except federal savings and loan associations." It is undisputed that Association is a savings and loan association as defined in section 5057.

A "savings and loan holding company" is defined in section 11500 and means any person or company which directly or indirectly owns, controls

or has the power to exercise a controlling influence over the management of a savings and loan association in the manner and as provided for in the statute. It is undisputed that Fidelity Financial is a savings and loan holding company as defined in the statute.

Section 7616 was enacted in 1953. (Stats. 1953, ch. 1454.) The statutes dealing with savings and loan holding companies were added as part 4 of division 2 of the Financial Code (§ 11500 et seq.) in 1964. (Stats. First Ex. Sess. 1964, ch. 103, § 5.) These statutes give the Commissioner limited jurisdiction over such holding companies. They provide for registration with the Commissioner, for reports to be made to the Commissioner, and for examination by the Commissioner.

When the holding company law was enacted in 1964 it made no reference to section 7616 or to derivative suits against holding companies. Section 7616 remained and still remains unchanged in its terminology. It appears, therefore, that it was the legislative intent to retain section 7616 in the form in which it was originally enacted and to restrict its applicability to savings and loan associations. We apprehend that savings and loan holding companies as general corporations are under the sole jurisdiction of the Corporations Commissioner and are subject to the provisions of the Corporations Code. The 1964 enactments in the Financial Code (§ 11500 et seq.) merely gave limited jurisdiction over the activities of holding companies and then only to the extent therein provided.

In view of the foregoing we are satisfied that a shareholder of a savings and loan holding company who desires to bring a derivative suit is relegated to the provisions of Corporations Code section 834 rather than section 7616. Under section 834 of the Corporations Code when a shareholder of a corporation brings a derivative suit, the corporation may move for an order that the plaintiff furnish security for reasonable litigation expense and attorney's fees on the following grounds: "(b) . . . (1) That there is no reasonable possibility" that the suit will benefit the corporation or its security holders; or (2) "That the moving party, if other than the corporation, did not participate in the transaction complained of in any capacity."

### Association

▮ Petitioner is entitled to bring a derivative action on behalf of Association provided he complies with the conditions specified in section

7616 and obtains a determination by the Commissioner that the proposed action is proposed in good faith, and there is a reasonable possibility that the prosecution of such action will benefit Association and its stockholders.

Pursuant to the provisions of section 7616 the privilege of instituting and maintaining a derivative action is given to a "stockholder" of a savings and loan association. Petitioner is not a stockholder of Association nor was he such a stockholder at the time he filed the application with the Commissioner for permission to institute the derivative action. He was then and is now a stockholder of Fidelity Financial. Petitioner does allege in his proposed complaint, however, that he was a registered stockholder of Association at the time of the transaction of which he complains.

We are persuaded from a reading of the provisions of section 7616 that one who is not a stockholder in a savings and loan association is not qualified to bring a derivative action on behalf of such an association. We do observe, however, that no challenge to petitioner's standing to institute or maintain such derivative action was made in the proceedings before the Commissioner or in the court below. We note further that no such challenge or objection was made to this court until the filing of petitions for rehearing.

Although we are inclined to deem the passive conduct of the Commissioner and the real parties to be a waiver of any objection to petitioner's standing to bring the derivative action, we have nevertheless concluded that under the circumstances presented in this case they may not now complain of petitioner's lack of standing. The record discloses that a demand was made by petitioner upon Fidelity Financial that it take action with respect to the transactions of which petitioner complains and that Fidelity Financial, the controlling stockholder of Association, declined to institute or maintain the action suggested by petitioner. We perceive in the light of the record and the proceedings below that all of the parties treated petitioner as the alter ego of Fidelity Financial and that in effect the proposed action was sought to be instituted and maintained by Fidelity Financial in the right of Association.

The Commissioner found that petitioner met all of the conditions specified in section 7616, excepting the conditions that petitioner's

derivative suit is proposed in good faith and there is reasonable possibility that the prosecution of the action will benefit Association and its stockholders. The Commissioner found adversely to petitioner in respect to these conditions and the superior court upon mandamus concurred in the Commissioner's determination. The issues on appeal, until the belated attack on petitioner's standing to bring the derivative action, were directed to the propriety of the Commissioner's determination.

### Functions of the Commissioner

Petitioner contends that the function of the Commissioner under subdivision (3) of section 7616 is not to decide all disputed issues of fact and law, but merely to screen proposed actions and to determine if the proposed action has *any* merit. He contends in the instant proceedings that the Commissioner undertook to make ultimate findings on all issues of law and fact. Association and Fidelity Financial assert that the function of the Commissioner is to "determine whether or not litigable issues existed" and that the Commissioner performed his duties properly in the instant proceeding. Meyer, Angell, Kerr and Guaranty contend that the role of the Commissioner includes "screening away actions that are clearly frivolous," and that "The Commissioner here did precisely that."

There are no cases delineating the duties of the Commissioner under section 7616, the allocation of the burden of proof in the proceeding before the Commissioner under said statute, or the proper standard of judicial review of the Commissioner's determination. Only two petitions have been presented to the Commissioner for his determination pursuant to section 7616—the instant application and one filed in 1961 by Robert King who sought leave to maintain a stockholder's derivative action against Empire Savings and Loan Association and its directors.

In the matter of the petition of King (hereinafter referred to as King) the Commissioner, based upon the facts and the record before him, determined that the action was proposed in good faith and that there was a reasonable possibility that the prosecution thereof would benefit the association and its stockholders. The Commissioner, in reaching this conclusion, considered the role of the Commissioner under section 7616. He stated: "This leads us to an examination of the issues underlying the facts as they were presented to us. Before we do this, it is important to

state the nature and scope of our duties as we conceive them under section 7616(3)(b). Our function, as we see it, is to screen away, in the first place, actions that are clearly frivolous from actions that are not. We do not pretend to, and indeed we cannot decide the case here on its merits. That is the function of the trial court. We can determine, however, whether or not the present action is built on facts rather than on thin air and so has *some* possibility of success. And we have to weigh, in the second place, the possible benefits to the association and its stockholders against the harm that the airing of the charges might inflict upon it."

■ It is well established that an administrative agency's construction of a statute, since it is charged with the enforcement of that statute, is entitled to great weight. (*Holloway* v. *Purcell,* 35 Cal.2d 220, 226 [217 P.2d 665] [cert. den. 340 U.S. 883 (95 L.Ed. 641, 71 S.Ct. 196)].) ■ We are persuaded the Commissioner's interpretation in King was correct. The Commissioner's function is to screen proposed actions that are frivolous from those that are not.

■ In his decision the Commissioner stated that the burden of proof was upon petitioner to establish the conditions specified in subdivision (3) of section 7616. We agree with this determination. Evidence Code section 500 provides that "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." Evidence Code section 115 defines "Burden of proof" as "the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court. . . .", and provides that "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence."

In view of the purpose of an action brought pursuant to section 7616, the burden imposed on the plaintiff is not a heavy one, but, as indicated in King, the plaintiff must establish by a preponderance of the evidence that the proposed action is built on facts rather than frivolity and that it has some possibility of success. The purpose of section 7616 is similar to that contemplated by section 834 of the Corporations Code. That purpose is to recover redress for some legal wrong which the corporation itself has suffered and to prevent failure of justice when the board of directors or trustees of the corporation refuse to prosecute such action. (*Turner* v. *Markham,* 155 Cal. 562, 569-570 [102 P. 272].) Such an action

seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of the failure of the corporation to act. (*Jones* v. *H. F. Ahmanson & Co.,* 1 Cal.3d 93, 106 [81 Cal.Rptr. 592, 460 P.2d 464].)

## Scope of Review

In reviewing the Commissioner's decision the trial court used the substantial evidence test. Petitioner, relying on *Strumsky* v. *San Diego County Employees Retirement Assn.,* 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29], and *Bixby* v. *Pierno,* 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242], contends that the trial court should have exercised independent judgment review because the administrative decision of the Commissioner affects a fundamental vested right.

We observe that when a judicial determination has been made, pursuant to Corporations Code section 834, whether to require the posting of a security by a stockholder as a condition to litigating a stockholder's derivative suit, the appellate courts have used the substantial evidence test in reviewing the determination of the lower court. (*Beyerbach* v. *Juno Oil Co.,* 42 Cal.2d 11, 24-25 [265 P.2d 1]; *Barber* v. *Lewis & Kaufman, Inc.,* 125 Cal.App.2d 95, 99-100 [269 P.2d 929]; *Wood* v. *Gordon,* 112 Cal.App.2d 374, 376 [246 P.2d 84].)

In *Bixby* the court was faced with the issue of whether the trial court in a proceeding in mandate to review a decision of the Commissioner of Corporations approving a recapitalization plan, correctly applied the substantial evidence test and found the commissioner's decision to be supported by such evidence rather than exercising its independent judgment in reviewing the decision. (At pp. 136-137.) The Supreme Court found that the lower court properly applied the substantial evidence test rather than the independent judgment test because independent judgment review is required only where a vested, fundamental right is involved, and that no such right was involved in this particular decision. (At pp. 143-144.) The gist of the holding in *Bixby* is that if an individual is applying for a right or benefit that he does not already have, the courts properly apply the substantial evidence test in reviewing the decision of the administrative agency in refusing to grant such an individual the right or benefit requested. (4 Cal.3d 130, 144-146.)

In *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court,* 259 Cal.App.2d 306 [66 Cal.Rptr. 183], several savings and loan associations with offices in Beverly Hills attempted to protect their interest in being free from additional competition by opposing the license application of another Beverly Hills savings and loan organization. The court observed that "By no stretch of imagination can petitioners' interest in being free from competition be deemed a 'vested' right. Petitioners do have a vested right in being permitted to continue operating their existing savings and loan businesses. That right, however, is not here threatened." (At pp. 316-317.)

As respects the instant case we conclude that the trial court was required to determine whether the findings of the Commissioner are supported by substantial evidence. Under section 7616 a shareholder may only bring a representative suit when the Commissioner determines he may do so. The proceedings before the Commissioner do not involve the loss of a right or benefit, but the acquiring of a right or benefit. The decision to deny the right to bring a representative suit would not "[affect] a right which has been legitimately acquired or is otherwise 'vested.' " (*Strumsky* v. *San Diego County · Employees Retirement Assn., supra,* 11 Cal.3d 28, 34.)

■ "If the administrative decision does not involve, or substantially affect, any fundamental vested right, the trial court must still review the entire administrative record to determine whether the findings are supported by substantial evidence and whether the agency committed any errors of law, but the trial court need not look beyond that whole record of the administrative proceedings." (*Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 144.) (fn. omitted.) ■ Thus, the lower court in the instant case properly applied the substantial evidence review of the administrative record, but it was the duty of the lower court·in so doing to review the entire administrative record.

This court, as an appellate court, is governed by the same substantial evidence rule and is restricted to the same evidence. (*Keithley* v. *Civil Service Bd.,* 11 Cal.App.3d 443, 448 [89 Cal.Rptr. 809]; *Le Strange* v. *City of Berkeley,* 210 Cal.App.2d 313, 321 [26 Cal.Rptr. 550].)

*Possibility of Success*

In determining whether petitioner met the requirement that there is a reasonable possibility that the action will benefit Association and its

stockholders the Commissioner was obliged to look at petitioner's proposed action in the light of certain legal principles applicable to directors and officers of corporations. ■ These principles articulate, in essence, that a director or dominant or controlling stockholder (or group of stockholders) is a fiduciary whose dealings with the corporation are subject to rigorous scrutiny, and that "where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." (*Pepper* v. *Litton,* 308 U.S. 295, 306 [84 L.Ed. 281, 289, 60 S.Ct. 238]; *Burt* v. *Irvine Co.,* 237 Cal.App.2d 828, 850 [47 Cal.Rptr. 392]; *Efron* v. *Kalmanovitz,* 226 Cal.App.2d 546, 556 [38 Cal.Rptr. 148].) ■ Directors owe a duty of highest good faith to the corporation and its stockholders, and this same duty is demanded of officers of the corporation. (*Burt* v. *Irvine Co., supra.*) It is a violation of this duty for officers, or directors or majority stockholders to give away or appropriate to themselves any corporate assets. (*Burt* v. *Irvine Co., supra.*)

We advert to the administrative record in the light of these principles.

In 1965 shareholders of First Peninsula California Corporation (hereinafter referred to as "California Corporation"), the parent company of Peninsula which was wholly owned by California Corporation, offered to sell Peninsula to Association. The negotiations continued intermittently until July 1968. The shareholders of California Corporation desired a cash transaction. However, at that time regulations and statutes did not permit one savings and loan association to invest cash in another savings and loan association. On July 24, 1968, Meyer entered into an agreement on behalf of himself and "Associates" for the purchase of a minimum of 80 percent (400,000 shares) of the stock of California Corporation at the price of $6.20 per share. Meyer's associates were Angell, Kerr and Guaranty. Guaranty's stock was owned 60 percent by Meyer, 20 percent by Angell, and 20 percent by one Robinson who was also a director of Association.

On September 13, 1968, the July 24 agreement was modified to provide that Meyer and his associates would be jointly and severally liable with California Corporation for the payment of any liabilities of California Corporation for the liquidation, dissolution and winding up of California Corporation and, in liquidation of California Corporation, for

the delivery, assignment and distribution to Meyer and his associates of California Corporation's shares in Peninsula.[2] In order to consummate this transaction Meyer and Angell borrowed $7 million from the United California Bank.

On September 26, 1968, it was resolved by the board of directors of Association that the officers of Association were authorized to negotiate a merger of Peninsula with Association. At a board of directors' meeting of Association held on October 24, 1968, it was determined that the stock of Association had a book value of $20.38 per share and that the merger of Peninsula and Association be approved on the basis that 500 shares of Association would be exchanged for each share of Peninsula stock. The merger ratio was determined on the "hard book value" of each corporation.[3] At the same meeting the directors also approved the merger of General Savings and Loan Association (hereinafter "General") with Association. Meyer and Angell abstained from voting. Kerr did not attend the October 24 meeting.

In December of 1968 Association sent to its stockholders a copy of a proxy statement ("Statement of General Terms of Proposed Merger") and a notice of a meeting to be held on December 30, 1968, to consider the merger. Petitioner voted against the merger. On December 30, 1968, the stockholders of Association approved the merger. The proxy statement did not disclose the purchase price Meyer, Angell, Kerr and Guaranty had paid for their stock in Peninsula. The statement revealed that Meyer owned 397.65 shares of Peninsula, representing 71.52 percent of its stock, and that Angell owned 132.55 shares of Peninsula, representing 23.84 percent of its stock.

On December 31, 1968, there was filed with the Commissioner an application for the approval of the merger of Association with Peninsula and General. On January 27, 1969, a hearing was held before the Commissioner on the application for the merger, and on March 7, 1969, the Commissioner issued an order approving the merger. Petitioner did not attend the hearing before the Commissioner as he was out of the country.

---

[2] At this time there were outstanding 556 shares of Peninsula of the 2,000 shares authorized to be issued.

[3] "Hard book value" is apparently determined by looking at the stated book value of an association and deducting from that amount any outstanding loans or assets that in the opinion of the person making the valuation are not worth their stated value and any probable loss that may occur on loan portfolios, bond portfolios (adjusting for current market value), etc.

On July 2, 1969, Fidelity Financial filed an application with the California Department of Corporations seeking approval to exchange seven shares of its stock for each share of Association. Stockholders of Association were notified of the hearing. Said hearing was held before the Commissioner on July 24, 29 and 30, 1969. The Commissioner approved the exchange ratio whereby Fidelity Financial was to acquire the stock of Association and was to assume the indebtedness of Meyer and Angell.

In September and October of 1968 the stock of Fidelity Financial was selling for a price in excess of $40 per share. The actual merger of Peninsula and General with Association was consummated as of December 26, 1969. As of October 1, 1969, the low bid price for Association's stock was $101 per share and the high asking price was $108.

Petitioner contended before the Commissioner that Meyer and Angell usurped a corporate opportunity when they purchased Peninsula. Meyer, Angell, Kerr and Guaranty, on the other hand, contended that Association could not by law purchase Peninsula on the terms demanded by sellers, i.e., an immediate sale for cash subject to no conditions. The Commissioner determined as a matter of law that Meyer and Angell did not usurp a corporate opportunity.

"The determination of the particular factual circumstances under which a fiduciary takes business opportunities for himself and the application of the ethical standards of fairness and good faith required from a fiduciary to said set of facts is mainly for the trier of facts." (*Industrial Indem. Co.* v. *Golden State Co.,* 117 Cal.App.2d 519, 534 [256 P.2d 677]; see *Guth* v. *Loft, Inc.,* 23 Del.Ch. 255 [5 A.2d 503].) Here the record is unclear that when negotiations broke off between Association and Peninsula in 1967 the Commissioner had formally disapproved of the proposed merger on the basis that Association would give its common stock and issue debentures to acquire Peninsula. A merger could have been accomplished under these terms if the Commissioner approved. (Former §§ 9200-9202.) There was testimony that Association was interested in Peninsula as a possible merger candidate until September of 1968. A question of fact therefore arises whether Meyer and Angell were under a duty to use their best efforts to have the merger approved rather than acquiring Peninsula for themselves. (See §§ 9202, 9203, 9204, 9205 and 9215, applicable to merger of savings and loan associations.)

In 1968 sections 9205 and 9215 were adopted allowing a savings and loan association to merge with another savings and loan association on a cash basis. These sections were approved by the Governor on August 8, 1968, and became effective on November 13, 1968. This circumstance presents the question whether Meyer and Angell were then required to give to Association the benefit of their agreement with Peninsula since Association could then acquire Peninsula on the terms it then demanded.

We apprehend that even if it should be determined that real parties did not usurp a corporate opportunity, the proposed action may nevertheless be said to have a reasonable probability of benefiting Fidelity Financial and Association. The transaction to be scrutinized will be subject to a finding that it was an inherently fair transaction from the viewpoint of the corporation. (*Jones* v. *H. F. Ahmanson & Co., supra,* 1 Cal.3d 93, 108-112; *Burt* v. *Irvine Co., supra,* 237 Cal.App.2d 828, 850-851.)

"By the terms of Corporations Code, section 820, 'Directors and officers shall exercise their powers in good faith, and with a view to the interests of the corporation.' That section further provides that a contract between a director and his corporation will not be invalid if there has been a disclosure and approval by the board or stockholders of the agreement with the interested director. However, '[e]ven though the requirements of section 820 are technically met, transactions that are unfair and unreasonable to the corporation may be avoided. [Citations.]' " (*Tevis* v. *Beigel,* 174 Cal.App.2d 90, 97 [344 P.2d 360].)

As already observed, dealings between the corporation and a director or a dominant or controlling stockholder, or group of stockholders, are subject to strict scrutiny and when challenged the duty is on the director or holder to prove both the good faith of the transaction and its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of this test is " 'whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.' [Citations.]" (*Burt* v. *Irvine Co., supra,* 237 Cal.App.2d 828, 851.) Whether such a transaction is fair is a question of fact for the trial court. (*Armstrong Manors* v. *Burris,* 193 Cal.App.2d 447, 460 [14 Cal.Rptr. 338].)

The Commissioner held that there was nothing unfair in the transaction under consideration "Although there is a difference in value

between the stock of Fidelity Savings to Meyer and Angell and the purchase price of Peninsula stock of $6.9 million by such individuals, . . ." In making such finding the Commissioner misconstrued his duties under section 7616 since he was purporting to decide the case on the merits rather than merely determining whether there was a basis for bringing the action. We here note that when the stockholders approved the merger they were not aware of the price paid by Meyer and Angell for the shares of Peninsula. Accordingly, since it cannot be said that the transaction under consideration carries the earmarks of an arm's length bargain, and this court cannot say that as a matter of law the transaction was fair and reasonable from the viewpoint of the corporation and those interested therein, this issue was one for the trier of fact in the proposed action and was not one to be decided by the Commissioner.

With respect to petitioner's claim that Meyer and Angell have made a profit, the Commissioner found that there is nothing to establish profit in any of the transactions. The Commissioner determined that there was a possibility that Meyer and Angell might make a profit because the ultimate value of Association's stock received by Meyer and Angell must be translated into the equivalent amount of Fidelity Financial's stock which was to be sold in the future at a price not yet determinable. The Commissioner also opined that such a sale could possibly result in a loss. This determination was a matter of speculation and was a matter for future determination and ascertainment. We perceive that while the "profit" referred to in the Commissioner's decision is a matter of speculation it is not a "myth" as asserted by Association and Fidelity Financial.

Petitioner argues that another way to view the transaction under consideration is that Meyer and Angell were acting as agents for Association when they acquired the stock of Peninsula and therefore any profits from the transaction belong to Association. However, it would appear that if Meyer and Angell have not usurped a corporate opportunity or the transaction may be viewed as inherently fair, that, then, they may not be regarded as agents acting for Association. (*Diedrick* v. *Helm,* 217 Minn. 483, 495-496 [14 N.W.2d 913, 919-920, 153 A.L.R. 649].)

An argument is made that petitioner is bound by the decisions of the Commissioner and the Corporations Commissioner that the terms

of the various mergers in question were fair, just and equitable. Petitioner received notification of the hearing held on January 27, 1969, and the hearings held on July 24, 29 and 30, 1969, but did not attend these hearings to object to the merger. Reliance is placed on the cases which deal with the issue of whether a party has exhausted his administrative remedies before turning to the courts for relief. (*Metcalf* v. *County of Los Angeles,* 24 Cal.2d 267, 269 [148 P.2d 645]; *Woodard* v. *Broadway Fed. S. & L. Assn.,* 111 Cal.App.2d 218, 224-225 [244 P.2d 467].)

██ "Our courts have repeatedly held that the mere possession by some official body of a continuing supervisory or investigatory power does not itself suffice to afford an 'administrative remedy' unless the statute or regulation under which that power is exercised establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties." (*Rosenfield* v. *Malcolm,* 65 Cal.2d 559, 566 [55 Cal.Rptr. 505, 421 P.2d 697].) ██ Section 9204,[4] providing for the Commissioner's approval for merger or consolidation and for the prerequisite findings to be made by the Commissioner, does not establish or provide for the clearly defined machinery for the submission, evaluation or resolution of petitioner's complaint which forms the basis of his proposed action. Accordingly, petitioner would not have been afforded a sufficient administrative remedy for the hearing and resolution of his complaints in the merger proceeding.

The foregoing narrative of the evidence adduced before the Commissioner, when considered in the light of the legal principles applicable to directors and officers of corporations as fiduciaries, militates against any contention that petitioner's proposed action is frivolous. The administrative record amply discloses that petitioner's proposed action is based on facts and not on surmise, suspicion or conjecture and that, therefore, it has *some* possibility of success.

[4]Section 9204 provides as follows: "Each merger or consolidation shall be approved by the commissioner upon a finding by him that the terms and conditions of the proposed merger or consolidation are fair, just, and equitable, and with respect to any constituent domestic association shall be made in conformity with the provisions of law applicable to mergers and consolidations in the case of corporations generally except as otherwise expressly provided in this article, and with respect to any constituent federal savings and loan association, be made in conformity with the provisions of the laws of the United States, and the rules and regulations of the Federal Home Loan Bank Board applicable to mergers and consolidations."

## Good Faith

The Commissioner found that the action was not proposed in good faith because it was instigated by petitioner's nephews, Thomas Stark and Fortney Stark, following a dispute between Association and Fortney Stark; the only payments of the costs incurred in the investigation of the matters which were the subject of the proposed action were made by Fortney Stark; petitioner made no independent investigation of the facts involved in the proposed complaint; and petitioner failed to take any action in the two merger proceedings before the Commissioner.

Petitioner is a shareholder of Fidelity Financial (2,100 shares) and was a shareholder of Association until it merged with Fidelity Financial. He is a law professor at the University of California at Los Angeles. Petitioner has two nephews, Thomas Stark and Fortney Stark, whose relationship to this proceeding was gone into in depth in the hearing before the Commissioner. Fortney Stark is president and chief executive officer of Security National Bank, and is also the controlling stockholder of the Security National Bank. Thomas Stark is executive vice president of Security National Bank and house counsel, and owns approximately 1 percent of the stock of the bank. Petitioner also owns stock in Security National Bank. Fortney Stark and a subsidiary of Security National Bank held legal title to Village Square Shopping Center in Orinda, California. In May of 1969 Association refused to make a loan to Fortney Stark and his associates on the shopping center. In July of 1969, Security National Bank and its subsidiary, through its counsel Cox & Cummins, caused a law suit to be filed naming Association, Angell and others as defendants with respect to a notice of default filed by Association in connection with a loan on the shopping center.

Fortney Stark was "incensed" over the pending merger of Peninsula and Association although he was not a stockholder of either organization. Fortney Stark mentioned to several other people that petitioner was an actual stockholder of Association. The Stark brothers asked petitioner to participate in bringing a derivative action on behalf of Association and Fidelity Financial. Apparently Fortney Stark had already consulted Cox & Cummins regarding the possibility of bringing such a suit.

In September and October of 1969, Thomas Stark reviewed various prospectuses of Fidelity Financial and other information concerning the subject merger and participated in the drafting of a letter dated October

23, 1969, sent by the law firm of Cox & Cummins to the directors of Association. The letter demanded that the directors take action against certain officers of Association, including Meyer and Angell, claiming that Meyer and Angell had damaged Association in an amount in excess of $27 million from corporate opportunities allegedly taken by them. Fortney Stark "withdrew" from these proceedings because he felt that he had no standing as a borrower member.

Petitioner testified that he has agreed to pay the costs of this suit although not the attorneys' fees. At the hearing he stated as of that date he did not know what the costs had been. It was his understanding that when Fortney Stark and another person were also going to be parties to the action that they would share the costs.

On May 27, 1970, petitioner signed a declaration which provides in part: "I have made an independent investigation of the facts contained in the letter of October 23, 1969, insofar as possible with the limited sources of information available to me." Petitioner testified regarding the allegations contained in the proposed complaint and the proposed amended complaint as follows: "I have no personal knowledge of these allegations or the facts on which they are based. I did rely upon my counsel. My counsel was retained to investigate this entire matter as well as to take whatever steps were appropriate."

The Commissioner, in his decision, states, "One cannot act in good faith if his actions are in any way motivated or guided by ulterior motives such as revenge" and that "Good faith requires fair dealings and full revelation."

Petitioner contends that the requirement of "good faith" was properly analyzed in King as follows: "Under the California law 'good faith' has been defined as 'honest belief founded on circumstances that make the belief reasonable.' *White* v. *Brinkman* (1937) 23 C.A.2d 307; 32 Cal.Jur.2d 82. Given such reasonable belief, motive, good or bad, or the presence or absence of malice is not determinative. . . . The question then is whether petitioner believes in fact that he has been wronged and believes also that he has a cause of action against the respondents."

We apprehend that the motive of a petitioner in bringing an action pursuant to section 7616 may not be shown by the defendant against whom it is proposed to file the action because the statute is for the

protection of the stockholders. Accordingly, if the proposed action will benefit the shareholders the motives of the petitioner are immaterial. (*Beyerbach* v. *Juno Oil Co., supra,* 42 Cal.2d 11, 25; *Ball* v. *Tolman,* 119 Cal. 358, 363 [51 P. 546]; see *Johnson* v. *King-Richardson Co.,* 36 F.2d 675, 677; *Young* v. *Higbee Co.,* 324 U.S. 204, 214 [89 L.Ed. 890, 898, 65 S.Ct. 594]; *Shirreffs* v. *Alta Canyada Corp.,* 8 Cal.App.2d 742, 747-748 [48 P.2d 55].) In *Beyerbach* the court made the following observation: "[T]he question before the trial court was not whether this was a 'strike suit'; the question for that court was whether, *regardless of plaintiff's motive in instituting the action,* there was or was not a probability of benefit to the corporate defendant." (At p. 25; italics added.)

The reliance of defendants Meyer, Angell, Kerr and Guaranty on *DeGarmo* v. *Goldman,* 19 Cal.2d 755 [123 P.2d 1], is misplaced. In *DeGarmo* the court held that a stockholder's derivative suit is an equitable action and as such the doctrine of clean hands applies. However, in that case the issue was whether a director of a corporation and owner of one-half of its stock could complain of the actions of two other directors when he personally benefited by the acts of the other directors. (At pp. 761, 766.)

We conclude that the "good faith" requirement of section 7616 means that the plaintiff must believe in the validity of his suit and not whether he has an improper or ulterior motive. It was only proper for the Commissioner to determine if petitioner believed in the merits of his proposed action. None of the reasons stated by the Commissioner in his decision for finding that the action was not proposed in good faith was a proper standard for him to apply in this proceeding. The phrase "good faith" "has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." (*People* v. *Nunn,* 46 Cal.2d 460, 468 [296 P.2d 813]; *Efron* v. *Kalmanovitz,* 249 Cal.App.2d 187, 192 [57 Cal.Rptr. 248].)

 Under the state of the record we fail to see how it can be held that petitioner is not acting in good faith. His proposed complaint states a cause of action; his action is not frivolous; and as already indicated his action has some possibility of success. If petitioner's action is successful it will redound to the benefit of Association and its stockholders.

*Conclusion*

We conclude that upon the entire administrative record there was no substantial evidence upon which the Commissioner could determine that there was no reasonable possibility that the prosecution of the action proposed by petitioner would not benefit Association or that such action was not proposed in good faith. We appreciate that it is elementary that an appellate court cannot examine evidence to determine where the preponderance of evidence lies (*In re Corey,* 230 Cal.App.2d 813, 823 [41 Cal.Rptr. 379]; *Bulkley* v. *Klein,* 206 Cal.App.2d 742, 751 [23 Cal.Rptr. 855]) and that our function is to determine whether the record contains any substantial evidence tending to support the finding of the Commissioner. (*In re Corey, supra,* at pp. 823-824; *Bulkley* v. *Klein, supra.*) But here the essential inquiry is whether petitioner's action is frivolous and whether it has some possibility of success. That inquiry, in the light of the entire administrative record, presents a question of law for an appellate court. (See *Morrison* v. *State Board of Education,* 1 Cal.3d 214, 238 [82 Cal.Rptr. 175, 461 P.2d 375]; *Oakland Unified School Dist.* v. *Olicker,* 25 Cal.App.3d 1098, 1106-1107 [102 Cal.Rptr. 421].) We opine that reasonable men cannot differ in their answer to this inquiry. A perusal of the Commissioner's decision discloses that he proposed to decide the merits of petitioner's action instead of confining his determination to the narrow issues delineated in subdivision (3) of section 7616.

We conclude, further, that as a matter of law, petitioner made an adequate showing before the Commissioner that he is entitled to bring the derivative action on behalf of the Association. The evidence produced at the hearing is susceptible of the sole construction that petitioner is entitled to bring such action. Accordingly, the Commissioner abused his discretion in denying petitioner's application and he may be compelled to act in accordance with the facts as established. (See *Bank of Italy* v. *Johnson,* 200 Cal. 1, 31 [251 P. 784]; *Inglin* v. *Hoppin,* 156 Cal. 483, 486-491 [105 P. 582].)

The judgment is reversed with directions to the trial court to issue the writ of mandate ordering the Commissioner to determine that petitioner may bring the derivative action on behalf of the Association.

Sims, J., and Elkington, J., concurred.

Petitions for a rehearing were denied September 10, October 8, and November 3, 1976, and the opinion and judgment were modified on October 18, 1976, to read as printed above. The petitions of all the respondents for a hearing by the Supreme Court were denied December 16, 1976.