[Civ. No. 17946. Third Dist. Dec. 12, 1979.]

ERNEST J. BAKMAN et al., Plaintiffs and Appellants, v.
DEPARTMENT OF TRANSPORTATION, Defendant and
Respondent;
CITY OF FRESNO, Real Party in Interest and Respondent.

COUNSEL

Fadem, Berger & Norton, Lerrigo, Thuesen, Walters, Nibler & Hedrick, William Stocker and Michael M. Berger for Plaintiffs and Appellants.

Richard G. Rypinski, John B. Matheny, Edward J. Connor, Jr., and Mark F. Mispagel for Defendant and Respondent.

James McKelvey, City Attorney, Hoge, Fenton, Jones & Appel and H. R. Lloyd, Jr., for Real Party in Interest and Respondent.

OPINION

WARREN, J.*—Bakman et al., Fresno homeowners (homeowners), appeal from the superior court's judgment denying their petition for writ of mandate requesting a new administrative hearing on an amended airport permit granted to Fresno Air Terminal (FAT).

*Facts*

Fresno (City) began operating FAT in 1948. FAT received a state airport permit in 1949, and also operates under a Federal Aviation Administration (FAA) permit. In 1949 only United and TWA served Fresno. Hughes Airwest began serving Fresno in 1962; PSA replaced TWA in 1972. All three carriers presently serving FAT use DC-8, 727 and 737 jets. Jet operations at the airport were initially itinerant military operations. From 1949 to 1964, certain tenants of FAT serviced military planes and jets, and during that period the commercial carriers' transition to jets involved frequent training flights. The National Guard has flown jets in and out since 1954.

_____
*Assigned by the Chairperson of the Judicial Council.

There are two parallel runways at FAT. Commercial carriers land on Runway 29-Right, 11-Left (29R-11L), and general aviation vehicles land on Runway 29-Left, 11-Right (29L-11R). The general aviation runway is 2,967 feet long and 75 feet wide. The commercial runway was originally 7,200 feet in length, but was extended approximately 2,000 feet in 1961, partially to safely accommodate jet traffic. Prevailing winds in the area are northwest-southeast, and 95 percent of all takeoffs and landings are conducted toward the northwest.

A federal commission report in the early 1950's recommended that a clear zone a length of one-half mile by a width of 1,000 feet be purchased at the end of each runway. In 1969 the City executed a grant agreement with the FAA for taxiway construction and lighting. As a condition of the grant, the City agreed to purchase all property within the clear zone to Runway 29R-11L before June 30, 1974, without federal participation. This included 22 residences in Parcel B which lies some distance away from the end of the runways. The agreement provided that the City would receive federal assistance in the future if it became eligible.

In 1972 the City engaged the firm of Peat, Marwick, Mitchell & Co. (PMM), an airport consulting firm, to prepare a 20-year master plan for FAT and the Fresno Chandler Downtown Airport. The final plan was contained in nine volumes and covered the six-county area served by FAT. PMM conferred with all users of the airport in order to predict the effects of the proposed improvements over the next 20 years. The resulting master plan recommended that the City purchase several parcels of real estate in the airport area, and that it relocate the general aviation runway.

These recommendations were in accordance with existing FAA recommendations, which included a clear zone with a length of one mile and a width of one-half mile on either end of the runway. Parcel B was partially within the proposed clear zone, Parcel C was 50 percent within the approach zone, and Parcel E was 60 percent within the approach zone. It was further suggested that Parcel D be acquired to prevent development of an incompatible land use in the vicinity of the airport.

Under then existing FAA air traffic management criteria, the center lines of the two runways had to be 700 feet apart in order to have simultaneous takeoffs and landings. Since the center lines of the runways were 662.5 feet apart at the time of the hearing, the general aviation

runway was to be moved 37.5 feet to the southwest. The plan also recommended that it be extended 1,500 feet to the southeast for a total length of approximately 4,800 feet for safety purposes. Aircraft would thus be taking off 1,500 feet farther away from the residences northwest of the airport so as to create less objectionable noise.

In regard to this particular phase of the master plan, namely, the acquisition of property in the clear zone and the relocation and extension of the general aviation runway, the City entered into a planning grant agreement with the FAA in September of 1972.

PMM prepared an environmental impact statement (EIS) as a condition of the grant agreement. The EIS covered the entire 20-year master plan.

On July 26, 1973, the City adopted the master plan and authorized the hiring of two independent appraisers to estimate the market value of 88 lots and homes in Parcel B which were proposed to be purchased pursuant to the master plan. Between August 1973 and June 1974, the City purchased 32 of those parcels. Between March 1973 and March 1974, it also purchased Parcel E with funds advanced by a flood control district and Parcel E was later leased to the district.

The city council authorized a public hearing for August 28, 1973, on the environmental aspects of the master plan pertaining to the proposed improvements. Public notice of the hearing was given July 29, 1973, 30 days before the hearing.

Three documents were prepared for the hearing: the natural environmental study, the preliminary environmental impact statement, and the community environmental study. The public notice specified where these documents could be reviewed.

After the public hearing, the preliminary impact statement was modified to include letters and comments received as a result of the hearing and it then became the draft environmental impact statement. This statement was subsequently submitted to the Division of Aeronautics, state Department of Transportation (DOT).

By a letter dated July 3, 1974, DOT advised that the report was deficient with respect to coverage of (1) "'mitigation measures proposed to minimize the impact'" and (2) "'the growth-inducing impact of the pro-

posed action.'" The California Environmental Quality Act (CEQA) required these two items which were not required under the federal environmental quality act. By a letter dated December 24, 1974, the City department of transportation replied, explaining that the various documents which had been submitted, when considered together, satisfied these requirements, and sent a draft environmental impact statement with the letter. At the date of the hearing DOT was considering whether these documents satisified its objections.

The Fresno Department of Transportation, with the help of the FAA, prepared an environmental impact assessment report with respect to the proposed property acquisition only. It was dated December 1974. Some of the contents were taken from the PMM master plan with the rest having been obtained from various city agencies.

Since some of the properties the City intended to acquire were outside the city limits, the City sought and received on December 30, 1974, the approval of the Fresno County Board of Supervisors for such acquisitions. The Fresno County Airport Land Use Commission adopted the master plan for FAT and Fresno Chandler Downtown Airport as the official plan of the commission.

FAT had received a letter in July of 1973 from DOT informing it that an amended airport permit was needed in regard to certain aspects of the master plan, and the FAA had indicated prior to that date that it also thought an amended permit was needed. The City filed for the permit on April 23, 1974. DOT then sent a letter to the FAA stating it would be inappropriate to allocate funds to the project until an amended permit had been obtained from the Division of Aeronautics. In November of 1974, FAT requested a hearing on the amended permit application because the federal grant money would expire June 30, 1975. In order to get reimbursement for the 22 residential properties in the clear zone portion of Parcel B, FAT had to submit its application to the FAA by March 1, 1975.

A hearing was set on the ground that interested persons had so requested. Appellant homeowners moved to intervene as parties and their motion was granted. However, the homeowners' motions to continue the hearing to a later date were denied. The hearing was held January 13-15, 1975. At the hearing the homeowners requested that conditions be imposed on the amended permit requiring FAT to comply with alleged violations of state law. On February 28, 1975, the hearing officer

rendered a proposed decision recommending that the amended permit be granted and DOT adopted that recommendation as its decision.

The homeowners then filed a petition for writ of mandate in the superior court, which was denied on the ground that they had not exhausted their administrative remedies. A hearing before the state Aeronautics Board was subsequently held on August 9, 1976, and the homeowners' request for a new administrative hearing was denied. They filed another petition for a writ of mandate in the superior court on September 8, 1976. This petition was heard and denied on March 7, 1978, and the homeowners appeal from that decision. (Code Civ. Proc., § 1094.5, subd. (f).)

On this appeal our review is limited to a determination whether there is any substantial evidence to support the trial court's findings and judgment. (*Mueller* v. *MacBan* (1976) 62 Cal.App.3d 258, 273 [132 Cal.Rptr. 222].)

The homeowners contend that DOT's decision is invalid because:

(1) It refused to consider FAT's alleged illegal operations;

(2) It has not prepared an EIR for FAT's permit application as required by CEQA;

(3) It refused to consider the impact of FAT's noise on nearby residents.

(4) It refused to consider the impact of FAT's alleged illegal efforts to coerce the homeowners to sell their homes to the airport at less than fair market value;

(5) The homeowners were not granted a fair hearing;

(6) DOT's findings of fact are inadequate; and

(7) DOT's decision should be tested via the reviewing court's independent judgment in a limited trial de novo.

## I

The homeowners first contend that DOT's decision is invalid because it refused to consider certain alleged illegal operations conducted presently and in the past by FAT.

In support of this, they first argue that the airport is in violation of the State Aeronautics Act (Pub. Util. Code, § 21001 et seq.) because of the change in use from propeller planes to jets over the years; that DOT has a duty through its permit proceedings to protect FAT's neighbors from violations of the State Aeronautics Act; and that DOT refused to consider the alleged illegal operations. The trial court concluded that FAT was operating legally and that an amended permit was properly issued.

FAT originally received its permit in 1949 under Public Utilities Code section 21667, which authorizes permits for airports already in existence on June 30, 1947. The homeowners argue that because FAT has acquired land, lengthened its runways, and changed its use from propeller planes to jets, FAT has been operating under an invalid permit. Title 21, California Administrative Code, section 3535, subdivision (c), provides that an amended site approval is required when there are changes in the use or class of an airport. Public, private and special use airports are defined in section 3525 of the Administrative Code and classification of airports is explained in section 3530. However, the change in the airport's use from propeller planes to jets did not occur after the original permit was issued as the homeowners argue. The record indicates that military jets have flown in and out of FAT since perhaps 1944, and at least since 1946. ■ Concededly, the number and size of jets has increased, but this does not constitute the type of change in use or class specified in section 3535, subdivision (c). Also, the permit issued to FAT in 1949 does not constitute an operating permit, but rather is a "site" permit. All references in the Administrative Code are to site permits (Cal. Admin. Code, tit. 21, §§ 3525-3541.) All references to such a permit in the Public Utilities Code are to "airport" permits and approval of a "site." (Pub. Util. Code, §§ 21666-21669.5.) Section 21664.5 of the Public Utilities Code, which requires an amended airport permit for the expansion of an existing airport, refers only to the expansion of the physical facilities of the airport. Thus, the change in the number and types of planes flying in and out of FAT does not constitute the type of change in use or class for which an amended permit is required.

The City's purchase of the residential units in parcel B does, however, constitute the type of physical expansion for which an amended permit is required under section 21664.5 of the Public Utilities Code.

■ DOT's counsel stated at the hearing that it considered the present operation of the airport legal and maintained that FAT had no obligation prior to this time to apply for an amended airport permit. Since DOT is charged with the administration of the pertinent statutes and regulations, its interpretation is entitled to great weight by a court. (*Lucas* v. *Hesperia Golf & Country Club* (1967) 255 Cal.App.2d 241, 249 [63 Cal.Rptr. 189]; see *Mueller* v. *MacBan, supra,* 62 Cal.App.3d 258, 271.)

The City and DOT correctly note that the purpose of the permit proceedings was not to determine whether the airport was in violation of the State Aeronautics Act.

Unquestionably, a major purpose of the act is to protect the public against noise and adverse environmental effects of airports (see Pub. Util. Code, § 21002; Cal. Admin. Code, tit. 21, § 3531, subds. (a)(3), (5)), and it is also true that DOT is required to weigh the advantages and disadvantages to the public of any proposed expansion of the airport's facilities. The Public Utilities Code mentions noise, air pollution and the burden on the surrounding area, including but not limited to surface traffic and expense, as major considerations. (Pub. Util. Code, § 21666, subd. (e).) However, the hearing on the proposed expansion of FAT was not the place for consideration of any purported violations of the statutory requirements by FAT except as they related to the project at that time under consideration, namely, the purchase of residential property in the clear zone of the runways and the relocation and extension of the general aviation runway. Public Utilities Code section 21664 states that if an airport applying for an expansion permit already holds a permit issued by DOT, the application shall be confined to a consideration of the matters enumerated in subdivision (e) of section 21666. Since this subdivision deals only with the environmental effects of the proposed airport expansion, the effect of FAT's proposed acquisition of residential property and the extension and relocation of the general aviation runway were the only topics properly considered at the hearing.

■ DOT does have a duty to protect the public from any violations of the airport permit requirements and it is unlawful for any political subdivision, any of its officers or employees, or any person to operate an

airport unless an appropriate permit has been issued by DOT and is still in effect. (Pub. Util. Code, § 21663.) DOT may revoke an airport permit if it determines that the owner or operator has failed to comply with any rule or regulation of the department (Pub. Util. Code, § 21668, subd. (d)) and it may be revoked without a hearing if public safety considerations are involved. (Pub. Util. Code, § 21668, subd. (c).) However, a proceeding involving an application for an amended permit for the purpose of expansion has no relation to a hearing for revocation of a permit. We therefore conclude that DOT had no duty to investigate any of the claimed violations of law in the hearing dealing with the proposed airport expansion and that the hearing officer properly limited the scope of the hearing to the issues before DOT in the permit application. (See *Negaard* v. *Department of Aeronautics* (1973) 32 Cal.App.3d 92, 96, fn. 2 [107 Cal.Rptr. 920].)

Furthermore, any objections the homeowners might have had to noise would properly have been raised in a nuisance action (*Greater Westchester Homeowners Assn.* v. *City of Los Angeles* ▆(Cal.App.)), and any complaints as to the purchase of their homes could have been raised in the action in inverse condemnation which was filed by the homeowners in March of 1974.

We conclude that there is substantial evidence to support the trial court's findings that FAT was operating legally and that an amended airport permit should not be denied on this ground.

## II

The homeowners next contend that DOT's decision is invalid because it has not prepared an EIR for the airport's permit application as required by CEQA. They argue that DOT's grant of an amended permit is a "project" within the meaning of Public Resources Code section 21065, and that DOT thus had to prepare or approve an EIR before the amended permit could be granted. The trial court found that an EIR was properly prepared and circulated.

▆ DOT itself was not required to prepare an EIR. Section 21151 of the Public Resources Code[1] requires that local agencies[2] shall pre-

---

[1] Projects undertaken by state agencies are covered by Public Resources Code section 21100.

[2] "Local agency" includes a city. (Pub. Resources Code, §§ 21062, 21063; Cal. Admin. Code, tit. 14, § 15031.)

pare, or cause to be prepared by contract, an EIR on any project they intend to carry out which may have a significant effect on the environment. Prior to completing the EIR, the local lead agency must consult with and obtain comments from each responsible agency and any public agency which has jurisdiction by law with respect to the project. (Pub. Resources Code, § 21153.) "'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (Pub. Resources Code, § 21067; Cal. Admin. Code, tit. 14, §§ 15030, 15065, subd. (a).) "Responsible agency" includes a public agency other than the lead agency, which has the responsibility for approving[3] a project. (Pub. Resources Code, § 21069.)[4]

Only one EIR need be prepared, and it must be prepared by the lead agency. (Cal. Admin. Code, tit. 14, §§ 15061, subd. (f), 15064, subd. (a).) The lead agency's documents shall be the environmental documentation for all responsible agencies. (Cal. Admin. Code, tit. 14, § 15064, subd. (b).) Thus the City's department of transportation, as the local lead agency, had the primary responsibility to prepare an EIR, whereas DOT, the state agency, was a responsible agency, and therefore was not required to prepare an EIR.

The homeowners contend, in the alternative, that DOT was required to approve an EIR before granting the amended permit.

There is no question that an EIR was required for approval of FAT's amended airport permit. Public Resources Code section 21065 defines "project" to include "(c) Activities involving the issuance to a person[5] of a lease, permit, license, certificate or other entitlement for use by one or more public agencies." A project is the whole of an action which has a potential for resulting in a physical change in the environment and is an activity involving the issuance to a person of a lease, permit, license, certificate or other entitlement for use by one or more public agencies. (Cal. Admin. Code, tit. 14, § 15037, subd. (a) (3).)

■  The amended permit application is properly considered a project within the meaning of Public Resources Code section 21065, subdivi-

---

[3]"Approval" includes issuance of a permit. (Cal. Admin. Code, tit. 14, § 15021.)

[4]"Responsible agency" includes all public agencies other than a lead agency which have discretionary approval power over the project. (Cal. Admin. Code, tit. 14, § 15039.)

[5]"Person" is defined under Public Resources Code section 21066 to include a city.

sion (a). DOT could therefore require the Fresno Department of Transportation to submit information to enable it to determine whether the project would have a significant effect on the environment, or to prepare an EIR. (Pub. Resources Code, § 21160.)

An EIR was prepared both with respect to the proposed alterations and with regard to the entire master plan. The master plan adopted by the City involved several proposed alterations of the airport property in addition to the two here in question. The City was required by its 1972 grant agreement with the FAA to file an environmental impact statement that met the requirements of the National Environmental Policy Act (NEPA).[6] This report was prepared under the direction of PMM, made part of the master plan and distributed to DOT along with the master plan. In addition, it appears that an environmental impact assessment report dealing specifically with the environmental impact of the purchase of various residential and nonresidential parcels surrounding FAT was prepared and submitted to the FAA by the Fresno Department of Transportation.

■ When an EIS has been prepared for the same project pursuant to the requirements of NEPA, any or all of that statement may be submitted in lieu of all or any part of an environmental impact report, provided that the statement or the part used complies with the requirements of CEQA. (Pub. Resources Code, § 21083.5; Cal. Admin. Code, tit. 14, § 15063, subd. (b).) If both an EIS and an EIR are required, the EIS shall be used if possible. (Cal. Admin. Code, tit. 14, § 15063, subd. (c).) Thus the four volumes constituting the EIS for the master plan and offered into evidence at the hearing would satisfy the statutory requirements for an EIR provided they met the requirements of CEQA as well as NEPA. The environmental impact assessment report separately prepared by the Fresno Department of Transportation in conjunction with the FAA satisfies the statutory requirement of a separate analysis by the lead agency. (Cal. Admin. Code, tit. 14, §§ 15061, 15068.5.)

The local responsible agency, the City, was required to certify the completion and adequacy of an EIR on the project, and to consider it in its approval of the master plan. (Pub. Resources Code, §§ 21061, 21002.1, subd. (d).) The City approved the master plan on July 26, 1973, and the master plan included the preliminary EIS. The City then scheduled a public hearing on the EIS, and the comments received were

[6]See 42 United States Code Annotated section 4321 et seq.

incorporated into the draft EIS. (See Cal. Admin. Code, tit. 14, § 15160, subds. (a), (c), §§ 15164-15165.)

The Fresno Department of Transportation, the local lead agency, was required to consult with and obtain comments from any public agency having jurisdiction by law with respect to the project. This included DOT. (Pub. Resources Code, § 21153; Cal. Admin. Code, tit. 14, § 15085, subds. (b), (d).) The City submitted the preliminary EIS to DOT, and DOT's comments and the response thereto were included with the draft EIS. As a responsible public agency, DOT was required to consider the environmental effects of the proposed relocation of the runway and the purchase of the residential properties. (Pub. Resources Code, § 21002.1, subd. (d); see Cal. Admin. Code, tit. 14, § 15085.5.) DOT considered these factors and specifically found that the environmental effects of the project were beneficial.

A representative from DOT testified at the hearing that DOT sent a letter to the Fresno Department of Transportation on July 3, 1974, stating that the preliminary EIS was deficient under CEQA in two respects. The Fresno Department of Transportation submitted the draft EIS in response on December 24, 1974. Even though DOT was still evaluating the draft EIS at the date of the hearing, the homeowners have not shown that DOT did not possess or supply adequate information to enable them to evaluate the environmental consequences of the amended permit.

■ Our determination of whether the statutory requirements for the preparation and consideration of an EIR have been met is governed by the provisions of Public Resources Code section 21168.5. This section provides that an agency's determinations will be upheld absent a showing of abuse of discretion. (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) We find no such abuse by DOT and therefore uphold the trial court's finding that an EIR was properly prepared and circulated, and accept the implication therein that it was also properly considered by the appropriate governmental entities.

### III

■ The homeowners next contend that DOT's decision is invalid because it refused to consider the impact of the airport's noise on nearby

residents. They argue in support of this that DOT has a duty to consider FAT's noise when evaluating the application for an amended airport permit.

Assuredly, one of the stated purposes of the State Aeronautics Act is to protect persons residing in the vicinity of airports against intrusions by unreasonable levels of aircraft noise to the greatest extent possible. (Pub. Util. Code, § 21002, subd. (g).) However, DOT may issue an amended permit if it is satisfied that the advantages to the public of the proposed airport expansion outweigh the disadvantages to the environment, including noise. (Pub. Util. Code, § 21666, subd. (e).) The ultimate development of the project must be considered so that DOT can evaluate the present and future protection of the site against noise and air pollution. (Cal. Admin. Code, tit. 21, § 3528, subd. (c).) The noise standards adopted by DOT are to be construed liberally to protect the public from noise. (Cal. Admin. Code, tit. 21, § 5001.) DOT was therefore under a duty to consider the noise effects of the proposed developments for which FAT sought an amended permit.

The record reveals that DOT did consider noise in its decision to grant an amended permit. The hearing officer admitted into evidence a noise study done by Olson Laboratories which was a subcontractor to PMM in regard to the master plan. This showed that the extension of the general aviation runway would actually reduce any noise problems suffered by residential areas northwest of FAT, because planes would be lifting off the ground approximately 1,500 feet sooner and would thus be higher in the air when they passed over the residences. The purchase of residential properties in the vicinity of the airport would also alleviate the noise problem that owners of these homes experienced because the City would not allow anyone else to buy the property. It proposed instead to turn the parcel in question into a public recreation area. The hearing officer found that the environmental effect of the project would be beneficial and DOT later adopted his proposed decision. Thus DOT adequately considered the possible noise effects of the alterations for which FAT sought the amended permit.

■ Additionally, however, the homeowners argue that FAT's historically demonstrated noise violates state statutes and DOT's own regulations governing noise.

The statutory standard is the level of noise acceptable to a reasonable person residing in the vicinity of the airport and the regulations adopted

by DOT may be considered in setting the standard. (Pub. Util. Code, § 21666, subd. (e).) The level of noise acceptable to a reasonable person residing in the vicinity of an airport is a community noise equivalent level (CNEL) of 65 decibels. (Cal. Admin. Code, tit. 21, § 5005, subd. (c).) Section 5006 of the California Administrative Code, title 21, describes the computation of the CNEL. Testimony and evidence offered at the hearing indicated that there were areas around the airport which received noise in excess of 65 decibels. However, the California Administrative Code indicates that these regulations must be complied with at a future date. Section 5012, subdivision (b), of title 21 of the Administrative Code requires that civilian airports must meet a CNEL noise level of 65 decibels by December 31, 1985. Until then, 70 decibels is an acceptable noise level. Section 5012, subdivision (c), provides that for airports which have 4-engine turbojet or turbofan air carrier operations and at least 25,000 annual air carrier operations (takeoffs plus landings), a level of 70 decibels must be met by January 1, 1981, and a level of 65 decibels must be met by January 1, 1986. The standard of noise acceptable to a reasonable person is established by the regulations, not by the homeowners' subjective testimony at the hearing or by expert testimony concerning human reaction to noise. The homeowners have made no showing that FAT violated or is violating these regulations, and counsel for DOT stated at the hearing that it considered FAT to be operating legally. Thus FAT has satisfied the provisions of Public Utilities Code section 21666, subdivision (e), which require that noise levels be acceptable to a reasonable person residing in the vicinity of the airport.

Public Utilities code section 21669.5 specifically states that the noise regulations adopted by DOT do not create a duty of care in favor of any person, and may not be deemed to create a presumption of damage to, or taking of, property. (Cal. Admin. Code, tit. 21, § 5004.) Thus the homeowners may not use the regulations to attempt to impose more stringent noise standards on FAT than those provided in the regulations.

Furthermore, DOT is not in a position to enforce the noise standards established by the regulations by its own volition. It is the county in which the airport is located which must enforce such noise standards. (Pub. Util. Code, § 21669.4, subd. (b); Cal. Admin. Code, tit. 21, § 5050, subd. (a).) The county is empowered to require noise monitoring by airports deemed to have a noise problem, and guidelines are given for determination that a noise problem exists. (Cal. Admin. Code,

tit. 21, § 5050, subd. (b).) Those who disagree with the county's findings may file an appeal with DOT which then investigates the validity of the county's findings. (Cal. Admin. Code, tit. 21, § 5050, subd. (c).) FAT has never been determined via this process to have a noise problem.

The hearing officer received evidence regarding noise levels studied by PMM and Olson Laboratories in preparation of the master plan. These studies indicated that the effect of the proposed alterations would be a reduction in noise levels in residential areas around the airport. Also, since the proposed alterations would not add to the operating capacity of the airport, noise levels would remain the same or even drop due to quieter jet engines expected to be developed in the future. Moreover, three persons dwelling in residences northwest of the airport testified as to their subjective reactions to the noise from airplanes departing and arriving at FAT. Thus it is evident that the hearing officer heard sufficient testimony about noise.

We conclude that the hearing officer properly limited the scope of the hearing to the potential adverse environmental effects of FAT's proposed alterations, and that DOT properly considered such effects in its decision.

IV

The homeowners next contend that DOT's decision is invalid because it refused to consider FAT's alleged illegal efforts to coerce certain homeowners into selling their homes at less than fair market value. The trial court found that this issue was irrelevant to the amended permit proceedings.

FAT's methods of purchasing the parcels covered by the amended airport permits were not properly before the hearing officer. Although DOT was required under CEQA to ascertain any possible adverse environmental effects of the proposed changes (Pub. Resources Code, § 21002.1, subd. (d), Cal. Admin. Code, tit. 14, § 15085.5), it was not required to investigate the means used to implement the proposals.

Government Code section 7274 provides that the guidelines create no rights or liabilities and do not affect the validity of any property acquisitions by purchase or condemnation. The guidelines thus provide no support for the homeowners' contentions in this regard.

In addition, the homeowners had administrative and judicial remedies available to them which would allow them to challenge the amounts offered for their homes and the appraisal methods used. Any person who believes himself aggrieved by a public entity's action regarding the amount he is paid under the relocation assistance and real property acquisition guidelines may have his claim reviewed by the head of the pertinent public entity. He may then petition DOT for review, and is additionally entitled to judicial review. (Cal. Admin. Code, tit. 25, §§ 6152, 6176.) Here, the homeowners also had the remedy of inverse condemnation, which they were pursuing at the time of the hearing.

Thus, although the hearing officer did permit the homeowners to present some testimony in this regard, DOT properly refused to consider FAT's efforts toward, and methods of, purchasing the homeowners' properties, and DOT was not required to impose conditions on the amended permit relating to such purchases. (See Pub. Util. Code, § 21666, subd. (d).) Similarly, the trial court properly determined that these issues were irrelevant to the permit proceedings.

## V

The homeowners contend that DOT's decision is invalid because they were not granted a fair hearing. ██ They first argue they were deprived of adequate notice and time to prepare their case. The trial court found that notice to the homeowners was not required.

FAT's application for an amended airport permit was filed on April 24, 1974. The homeowners requested a hearing in the fall of 1974. Notice of the hearing was mailed to them on December 5, 1974, with the hearing being held on January 15-17, 1975. They thus received at least one month's notice of the hearing. Since Government Code section 11509 provides that an agency shall deliver or mail a notice of hearing to all parties at least 10 days prior to the hearing, the homeowners received adequate notice.

The homeowners also argue that they were deprived of the right to present evidence and cross-examine witnesses. We find that their right to present evidence and to cross-examine witnesses was subject to the limited scope of the hearing, was properly controlled by the hearing officer, and that he relaxed the limitations considerably in the homeowners' behalf. The record reveals that counsel for the homeowners was permitted extensive cross-examination on all matters rel-

evant to the issues presented by the petition for an amended airport permit and was even given special latitude on both cross-examination and presentation of evidence beyond the scope of the hearing.

The homeowners complain that the hearing officer unreasonably interfered with the presentation of their case in that he refused to enforce a subpoena duces tecum by which they sought to compel production of materials they did not have time to obtain by discovery, and that the hearing officer unreasonably required counsel for the homeowners to explain the direction his cross-examination would take.

In regard to the subpoena duces tecum, the hearing officer properly quashed the first two paragraphs of the subpoena. They dealt with documentation of the reasons for the proposed real property purchase and any appraisals and offers made. These matters were irrelevant to the permit hearing. The rest of the subpoena was to be considered when FAT's director testified and the documents were offered into evidence. The record reveals that the homeowners had already obtained almost all of the desired documents by means of discovery in their inverse condemnation action. New documents included two letters and an updated version of an EIR they had previously received. The ruling on the subpoena was therefore proper and as to the paragraphs not quashed, the homeowners either already had the material in question or received it at the hearing.

As to the second issue, we find that the hearing officer properly requested that the homeowners' counsel state the direction of his questions on cross-examination. This limitation was necessary to prevent undue consumption of time in exploration of irrelevant issues.

The homeowners additionally argue that the hearing officer expressed an undisguised bias against them. Those not present at the hearing cannot judge such matters as facial expressions and oral nuances, but the record indicates that this allegation is simply not true. It instead reveals that the hearing officer demonstrated remarkable patience and good humor in the face of attempts by counsel for the homeowners to cross-examine and present evidence on entirely irrelevant matters, that he stretched his own rulings in the homeowners' favor, and that he allowed two homeowners, and one of their daughters, to testify on matters outside the scope of the hearings.

Since we find absolutely no error or other impropriety in the hearing officer's rulings and conduct, we conclude that the trial court properly determined that the homeowners were not denied a fair hearing.

## VI

The homeowners contend that DOT's findings of fact are inadequate, but we find that the trial court properly concluded that the findings are adequate.

The homeowners argue that DOT has failed to make findings of fact on all material issues. In this regard, the only issue relevant to the permit hearing was whether FAT was to receive an amended airport permit allowing it to relocate and extend the general aviation runway and to purchase certain parcels of residential property surrounding the airport. The hearing officer made findings on this issue, which were subsequently adopted by DOT as its decision. Contrary to the homeowners' assertion, these findings satisfied the requirement in Public Utilities Code section 21666, subdivision (e), that DOT consider the environmental effects of the proposed alterations to the airport. (See Pub. Resources Code, § 21002.1, subd. (d).) The list of issues upon which the homeowners assert DOT should have made findings of fact involves matters outside the scope of the hearing and DOT was therefore not required to consider those issues.

The homeowners also claim that DOT's conclusions are contrary to or unsupported by the evidence. They challenge DOT's conclusions that FAT is in compliance with applicable FAA safety standards, that no adverse environmental effect would result from the proposal, and that FAT has complied with Public Utilities Code section 21666.

The homeowners have made no showing that FAT was not complying with applicable safety standards or that it would not be in compliance upon completion of the alterations for which the amended permit was sought. Neither have they made any showing that the alterations which were the proper subject of the hearing would have any adverse environmental effect. In fact, the evidence demonstrates that the proposed alterations will have a beneficial environmental effect. The homeowners have also failed to show a lack of material compliance with Public Utilities Code section 21666. Therefore, DOT's findings are supported by substantial evidence. (*Topanga Assn. for a Scenic Community* v. *Coun-*

*ty of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12].)

The homeowners additionally argue that DOT's conclusions are not supported by its findings of fact citing *Topanga, supra,* as support for their statement. ■ *Topanga* held that section 1094.5 requires the agency which renders a challenged decision to set forth findings. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 515.) These findings must expose the agency's mode of analysis so as to enable a reviewing court to trace this analysis. (At pp. 516-517, fn. 16.) They may not be set forth solely in the language of the applicable legislation. (At p. 517, fn. 16.) However, formal findings of fact, such as would be prepared by a court, need not be made. (*Hadley* v. *City of Ontario* (1974) 43 Cal.App.3d 121, 128 [117 Cal.Rptr. 513].) Administrative findings will be deemed adequate where they apprise interested parties and the courts of the bases for the administrative action. (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 596 [122 Cal.Rptr. 100].)

Parenthetically, we disagree with respondent's contention that *Topanga* does not apply to the case at bench. *Topanga* applies to all types of review of quasi-judicial administrative actions (*McMillan* v. *American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 182 [131 Cal.Rptr. 462]) such as the grant of a permit of the type in question.

We conclude that the findings of the hearing officer, as adopted by DOT, are sufficient to inform the parties and the courts of the bases for the administrative action. The hearing officer's findings and conclusions covered four and one-half pages. He was not required to make a finding on every evidentiary matter urged by the homeowners (see *Midstate Theatres, Inc.* v. *County of Stanislaus* (1976) 55 Cal. App.3d 864, 888 [128 Cal.Rptr. 54]) and most of their claims fell outside the proper scope of the hearing.

The homeowners argue also that DOT's conclusions are contrary to law. ■ They assert that DOT incorrectly placed the burden of proof on them to establish cause for denial of the permit, pointing to a statement in the hearing officer's proposed decision, later adopted by DOT as its decision, that they had not shown grounds for denial of the permit. They correctly note that the burden of proof is on an applicant for an amended permit and that an applicant must satisfy the require-

ments set forth in Public Utilities Code section 21666. (Pub. Util. Code, § 21664.5.) The hearing officer expressed concurrence in this position at the commencement of the hearing. The homeowners sought, however, to have DOT impose certain conditions on the grant of the amended permit which DOT does have the power to impose. (Pub. Util. Code, § 21666, subd. (d).) In the statement complained of, the hearing officer merely stated his conclusion that the homeowners had failed to establish cause for denial of the permit on the grounds they argued. He was not thereby shifting the burden of proof to them as to the permit itself, but simply stating that in his opinion the requirements of Public Utilities Code section 21666 were satisfied.

## VII

Lastly, the homeowners contend that DOT's decision should be tested according to the reviewing court's independent judgment in a limited trial de novo. They argue that their right to peaceful use and enjoyment of their homes is a vested right. The trial court applied the substantial evidence test.

*Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234], held that in reviewing administrative decisions which substantially affect a fundamental, vested right, the trial court must exercise its independent judgment upon the evidence disclosed in a limited trial de novo as well as considering the record. (*Bixby, supra,* at p. 143.) If no fundamental vested right is involved, the court reviews the administrative record to determine whether it is supported by substantial evidence. (At p. 144.) In determining whether a right is fundamental the courts must consider the effect of it in human terms and the importance to the individual in his life situation, as well as in the economic aspect. (At p. 144.) A right which is vested is one already possessed by an individual. (At p. 146.) In this regard, the Supreme Court has pointed to the right to practice one's profession or a deprivation of property (at p. 147), as well as various rights established as fundamental by the United States Supreme Court. (At p. 145, fn. 12.) (See also *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].)

The cases most closely related to the homeowners' claimed right to enjoyment of their property deal with land use and zoning. Landowners have been held to have no vested rights in any particular use of their property unless the restrictions on the use of the property constitute an

uncompensated taking, direct or indirect, or the damaging of their property. (*Davis* v. *California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 700, 708 [129 Cal.Rptr. 417].) The grant of a conditional use permit or a zoning variance does not infringe on a fundamental vested right of owners of the adjoining property or protesting parties. (See *Simons* v. *City of Los Angeles* (1977) 72 Cal.App.3d 924, 929 [140 Cal.Rptr. 484]; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, 510, fn. 1; *Jones* v. *City Council* (1971) 17 Cal.App.3d 724, 728 [94 Cal.Rptr. 897].) The denial or grant of a zoning variance has been held not to affect a vested right of the applicant. (*Siller* v. *Board of Supervisors* (1962) 58 Cal.2d 479, 484 [25 Cal.Rptr. 73, 375 P.2d 41].) When a coastal zone permit is granted over an individual's objection and he seeks judicial review to overturn the decision, no vested right is infringed. (*Sierra Club* v. *California Coastal Zone Conservation Com.* (1976) 58 Cal.App.3d 149, 155 [129 Cal.Rptr. 743].)

█ These cases indicate that no fundamental property right of the homeowners was involved in DOT's grant of an amended airport permit to FAT and that the scope of the hearing was properly limited to the application for the permit. Since the homeowners have not shown that they possessed a fundamental right which was involved in DOT's action, they may not obtain independent judgment review. (*Sierra Club, supra,* 58 Cal.App.3d at pp. 155-56.) Thus the standard at the trial court and on appeal is the substantial evidence standard. (*Bixby* v. *Pierno, supra,* (4 Cal.3d 130.)

The judgment is affirmed.

Regan, Acting P. J., and Janes, J.,* concurred.

A petition for a rehearing was denied January 9, 1980, and appellants' petition for a hearing by the Supreme Court was denied February 7, 1980.

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.